```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON
```

LAWSON HEIRS INCORPORATED,
a Virginia corporation

    Plaintiff,

v.                                    Civil Action No. 2:17-cv-2198

SKYWAY TOWERS, LLC, a
Delaware limited liability
Company, and DELORSE FRY FARLEY,
and HOWARD LEE FARLEY JR.,
husband and wife,

    Defendants.

## MEMORANDUM OPINION AND ORDER

Pending is the motion for summary judgment on the issue of punitive damages sought herein by plaintiff against defendant Skyway Towers, LLC ("Skyway"), which motion was filed by Skyway on May 21, 2018.

### I. Factual and Procedural Background

This case arises out of construction of a cellular communications tower by Skyway on a plot of land that plaintiff, Lawson Heirs Incorporated ("Lawson"), alleges is at least partially owned by Lawson and partially owned by other defendants Howard Lee Farley, Jr. and Delorse Fry Farley (together, "Farley defendants"). Compl. ¶¶ 5-10.

1

Lawson owns property adjacent to property owned by the Farley defendants. See Email LH 0318 Ex. H Pl.'s. Resp. Def.'s Mot. Summ. J. ("Pl.'s Resp."). In 2015, Defendant Skyway was seeking a site to build a cellular communications tower for use by Verizon Wireless. See Email LH 0252 Ex. 1 Def.'s Mot. Summ. J. ("Def.'s Mot."); Email LH 0261 Ex. 2 Def.'s Mot.; McMillen Dep. 16. Ex. 11 Def.'s Mot.; Def.'s Mem. Supp. Mot. Summ. J. 2 ("Def.'s Mem."). One of the potential build sites was located solely on the Lawson property, and a second was seemingly located on the Farley property. Email LH 0261 Ex. 2 Def.'s Mot.; see Email LH 0252 Ex. 1 Def.'s Mot. In November of 2015, the site that was ostensibly on the Farley property was selected as the final construction site. Email LH 0261 Ex. 2 Def.'s Mot.

On November 19, 2015, Ken Kuszpit, a representative of Strategis, LLC ("Strategis"), the selection contractor hired by Skyway, contacted Lawson representative Charles Howard, and informed Lawson that Mr. Farley ensured that the selected site was fully on the Farley lot. Id.; see McMillen Dep. 16. Mr. Kuszpit stated that "we will naturally confirm that [assertion] with a survey." Email LH 0261. On December 11, Mr. Howard emailed Mr. Kuszpit expressing an interest in the location of the selected site, stating: "Given the importance of the property boundary with Mr. Farley, and inasmuch as the chosen

2

site may be but a stones [sic] throw away from said boundary, [Lawson] would like to see the results of the recent boundary survey."  Email LH 0012 Ex. C Pl.'s Resp.  On December 14, 2015, Mr. Howard informed Mr. Kuszpit that he had been "research[ing] old maps going back to 1927 and all show the boundary with Farley . . . as following the ridge line going south towards the highway."  Email LH 0011 Ex. C Pl.'s Resp.

Skyway contracted with Robert McMillen of McMillen Consulting in November or December 2015 to conduct the surveys of the selected site.[1]  McMillen Dep. 13, 16-17, 24.  Because Mr. McMillen is not a licensed surveyor in West Virginia, he associated with a Mr. Whitman,[2] of Encompass Energy Services, who stamped the final survey.  See McMillen Dep. 43-46; Def.'s Mem. 2; Pl.'s Resp. 3.  The site selected by Skyway for the tower had no setback from the western edge of the Farley property, so Mr. McMillen testified that he "tried to go the extra mile to determine where that property line was," and agreed that "if [he] was off, even by a matter of inches, [the site] would be

---

[1] Specifically, Skyway hired an engineering company, GDP, which in turn selected McMillen to conduct the site survey. McMillen Dep. 16-17.
[2] Mr. McMillen testified that the surveyor licensed in West Virginia was named William J. Whitman, and plaintiff refers to Mr. Whitman as William J. Whitman, II. McMillen Dep. 45; Pl.'s Resp. 3 n. 2. Defendant refers to Mr. Whitman as Robert J. Whitman. Def.'s Mem. 2.

encroaching on the other parcel of property." Id. at 26. However, he denied that "anyone had made [him] aware that there was some issue as to where this western boundary line was located, [or] that [Lawson] thought it might be on their property." Id. at 25-26. Mr. Farley represented to Mr. McMillen that the western edge of his property, the edge that is the subject of this suit, "was the fence line all the way up to the gate. And then it shot up over the hill to an old stump up there." Id. at 18.

In the course of the survey, Mr. McMillen conducted both fieldwork, wherein he physically inspected the property, and deed work, wherein he researched the chain of deeds describing the plot, in order to determine the property boundaries. Id. 19-22. To "set the corners" of the Farley land, Mr. McMillen testified that he used a deed for the Lawson plot, because "it was the only one that had bearing distances on it," though, he stated, there were still "some problems" with the Lawson deed. Id. at 22. Specifically, he stated the Lawson deed "didn't line up with the physical -- the physical locations," and "the deed kicks too far to the -- to the west." Id. Mr. McMillen produced his original survey drawing on

December 14, 2015 locating the western edge of the cellular tower site as falling precisely on the western edge of the Farley property. See LH 0014-0016 Ex. C Pl.'s Resp.

On February 22, 2016, the survey of the Farley property boundary was sent to Lawson representative Charles Howard. Email LH 0010 Ex. 3 Def.'s Mot. In that email, Mr. Kuszpit stated that the cellular tower site "abuts [Lawson] property but is on the Farley's property." Id. That same day, Mr. Howard informed Mr. Kuszpit that Lawson was going to have its "own surveyor mark the boundary very soon." Email LH 0293 Ex. E Pl.'s Rep. On May 31, 2016, Lawson representative Larry George emailed Strategis representative Ryan Johnson informing Skyway that the Lawson surveyor had "completed his work and determined that at least part, if not all, of the proposed tower and its infrastructure are situated on [Lawson] land." Email LH 0320 Ex. H Pl.'s Resp. Approximately one hour later, Mr. Johnson requested the copy of the Lawson surveyor's work for review. Email LH 0319-0320 Ex. H Pl.'s Resp.

Though a complete survey was not produced, some documents from Lawson's surveyor, Roger Tackett, were provided to Skyway on May 31, 2016. Def.'s Mem. 3-4. After reviewing

the site and a number of deeds tracing back to 1894,[3] Mr. Tackett came to the opinion that the Lawson property line did not follow the fence, as Mr. Farley asserted, but instead matched the topographical features of the land; Mr. Tackett described the "center of the point, knob, and ridge as the division line of the property." Email LH 0303-304 Ex. G Pl.'s Resp; 1894 Deed LH 0379 Ex. G Pl.'s Resp. (including references to boundaries going "straight up the hill").

Mr. George then stated his belief that "the next step is for [Lawson] to contact Mr. Farley directly and share our position with him," said he would "send him a letter in the coming week," and asserted that Lawson was "relying on the description of the boundary in the April 27, 1934 Deed," one of the deeds describing the property that was reviewed by Mr. Tackett. Email LH 0318 Ex. H Pl.'s Resp. Mr. Johnson responded that he would "have [Lawson's] surveyor review all their documentation" and advise the Farley defendants of the forthcoming letter. Id. Skyway's surveyor rechecked and revised the survey drawings at least once in response to Lawson's concerns. McMillen Dep. 57-60. A complete survey was

---

[3] Mr. Tackett identified nine deeds that relate to the Farley defendants' property. Deed List LH 0378 Ex. 8 Def.'s Mot. These deeds are dated April 6, 1894; April 28, 1900; June 14, 1900; February 26, 1934; April 27, 1934; April 5, 1945; November 6, 1961; August 9, 1972; and June 18, 1997. Id.

6

never given to Skyway by Lawson and the record does not indicate that any further communication regarding the property took place between early June of 2016 and December of 2016. See Def.'s Mem. 3; Emails LH 0318-0321 Ex. H Pl.'s Resp.

In November 2016, construction began on the site that was ostensibly leased by Skyway from the Farley defendants, without giving notice to Lawson. Behuniak Dep. Ex. B Pl.'s Resp. 122, 125-26. On December 9, 2016, shortly after construction had begun, Lawson sent Skyway a cease and desist letter reasserting its belief that the subject tower was to be constructed at least partially on Lawson land and requiring that Skyway "cease and desist from any further unauthorized entry and trespass on the lands." Cease and Desist Letter ("Letter") Ex. 6 Def.'s Mot.; see Option and Lease Agreement Ex. F Pl.'s Resp. The letter further stated Lawson "is open to entering a lease with the appropriate entity for the construction and operation of this tower." Id. Following this letter, Skyway engaged legal counsel, Robert Grant, to correspond with Lawson. Def.'s Mem. 3; see Email LH 0371-0372 Ex. 7 Def.'s Mot.

After a phone call between Mr. Grant and Lawson representative Mr. George that took place on December 15, 2016, Mr. Grant again sought to obtain a copy of the survey completed by Lawson's surveyor by email on December 22, 2016. Email LH

0371 Ex. 7 Def.'s Mot. On December 28, 2016, Mr. George provided Mr. Grant with the same documents that had been previously given to Skyway in support of Lawson's assertions, including the 1894 deed, which described what is now the Farley property. Email LH 0369-0379 Ex. J. Pl.'s Resp.; Documents LH 0373-0387 Ex. J Pl.'s Resp. Mr. George summarized that Lawson's position of using the ridge as the property line was based primarily on the language in the 1894 deed. LH 0370 Ex. J Pl.'s Resp. Mr. George further advocated for this position because "most of the old property lines in the coal fields follow creeks and ridges, etc." Id. Skyway again had its surveyor check and confirm that the leased area was entirely contained on the Farley defendants' property in response to Lawson's concerns. See Emails LH 0019-0020, 00368-369 Ex. J. Pl.'s Resp.

Despite their correspondence and the receipt of a cease and desist letter, construction was resumed, and on February 24, 2017, Lawson's representative Mr. George sent the following email to Mr. Grant:

> [W]e seem to be having some miscommunication about the Skyway[] cell tower in Logan County, WV. I understood that Skyway had agreed to provide a new boundary line plat which we could review before any further construction occurred . . . . I was just advised by our land manager/engineer that a contractor is on site with two men operating a backhoe to level the site on the lands of [Lawson]. I can send you a picture if you like. Please advise your client to cease and desist all construction activity on [Lawson] lands and

8

>     to remove all equipment and persons from the same.
>     The failure to do so will bring immediate legal action
>     in the Circuit Court of Logan County.

Email LH 0019 Ex. J Pl.'s Resp. Construction continued and the subject tower was completed by March of 2017. Behuniak Dep. 132. Thereafter, Lawson filed this suit on April 3, 2017.

In its complaint, Lawson alleges a claim against Skyway for trespass, a claim against all defendants for ejectment, and petitions for ascertainment and designation of the boundary line. Compl. ¶¶ 11-29. Additionally, Lawson seeks punitive damages against Skyway contending that Skyway, "in trespassing upon and causing damage to plaintiff's property, . . . acted in bad faith, vexatiously, wantonly, willfully and/or oppressive reasons and in reckless disregard of the rights of others." Compl. ¶¶ 30-32. Skyway now seeks summary judgment on the issue of punitive damages only. Def.'s Mot. 1. The record indicates that both Lawson and Skyway remain unwavering in their opposing beliefs about the true location of the boundary line between the two properties.

## II. Governing Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "Material" facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (same). A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

### III.  Discussion

Punitive damages may be awarded "[i]n actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear." Syl. pt. 4, Mayer v. Frobe, 40 W. Va. 246, 22 S.E. 58 (W. Va. 1895). Demonstrating reckless conduct that justifies an award of punitive damages "has long required more than a showing of simple negligence." Bennett v. 3 C Coal Co., 180 W. Va. 665, 379 S.E.2d 388, 394 (1989). Rather,

> [W]anton negligence is a "[r]eckless indifference to the consequences of an act or omission, where the party acting or failing to act is conscious of his conduct and, without any actual intent to injure, is aware, from his knowledge of existing circumstances and conditions, that his conduct will inevitably or probably result in injury to another."

*Stephens v. Rakes*, 235 W. Va. 555, 566, 775 S.E.2d 107, 118 (2015) (quoting *Stone v. Rudolph*, 127 W.Va. 335, 345, 32 S.E.2d 742, 748 (1944)). Punitive damages may be awarded for actions in trespass where the alleged trespass is willful, but if it is committed through "inadvertence or mistake, or in good faith, under an honest belief that the trespasser was acting within his legal rights, it is an innocent trespass," and punitive damages are not warranted. See Syl. pt. 4, *Reynolds v. Pardee & Curtain Lumber Co.*, 172 W. Va. 804, 310 S.E.2d 870 (1983). An award of punitive damages is reserved for "extreme and egregious bad conduct" -- it "is the exception, not the rule," and "the level of bad conduct on the part of the defendant must be very high in order to meet the punitive standard." *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815, 909-10 (2010).

Lawson asserts that it raised concerns over the boundary line between its property and the Farley defendants' property by "clearly inform[ing] Skyway" of its belief "that the cell tower construction . . . encroached upon its property." Pl.'s Resp. 9. Therefore, because Skyway had knowledge of Lawson's concerns, yet proceeded to move forward with construction, Lawson believes that punitive damages are warranted if a trespass did, in fact, occur. Id. Lawson adds:

> Although [Skyway] was clearly aware of these issues
> and the undeniable facts casting doubt upon its chosen
> location, the undisputed facts show that Skyway
> nonetheless willfully and intentionally proceeded to
> enter upon the designated site and engage in major
> construction operations in November of 2016 and
> refused to cease and desist when directly confronted
> by [Lawson] in early December 2016.

Id.

Notwithstanding these allegations, the record demonstrates that Skyway took efforts to survey the property to determine the boundary line multiple times, both before and after Lawson had raised its concerns with the purported boundary. See McMillen Dep. 19-26, 57-60. It is further apparent that Skyway took actions in reliance on the surveys and examinations produced by Mr. McMillen regarding the boundary line and its relation to the cellular tower construction site, as Mr. Behuniak, the president and chief operating officer of Skyway, testified repeatedly:

> Q. And you were satisfied, after looking at these
> [surveys], that the property was -- cell site wasn't
> located entirely on the Farley property?
> A. We relied on our professional surveyor's
> determination.
> . . . .
> Q. Okay. So, potentially, we have a dispute over
> title here, and one party contending that the cell
> site extends onto their property, across a boundary
> line, and there's no notification to them that
> construction is going forward?
> A. No. At this point, our licensed surveyor had told
> us we were okay, so we proceeded.

> . . . .
> A.   Our survey -- our surveyor told us we were fine.
> . . . .
> Q. All right. But as you sit here today -- and you know that it's possible that different maps get attached to different e-mails, and there's a document collection process here that goes on. But as you sit here today, you don't have an independent opinion as to which of these is the true property line?
> A. I do, from our surveyor.
> Q. Okay. And which one reflects the true property line? Any of these maps that we've put in front of you?
> A. I would say, the one that's attached to this one.
> Q. Your answer is basically, whatever the surveyor says; correct?
> A. If I --
> Q. If I put Mr. McMillen in the chair and he says this is the right one, that's what you're going to go with?
> A. That's what I'm going to go with.
> Q. All right.
> A. Rely on his professional --
> Q. All right. That's fine.

**Behuniak Dep. 8, 71, 125-26, 133, 147-48.**

In light of Skyway's reliance on the opinions of its surveyor, the record does not indicate that, if a trespass did occur, it was the result of anything other than "inadvertence or mistake," or that it was not done "in good faith, under an honest belief that the trespasser was acting within his legal rights." Syl. pt. 4, <u>Reynolds</u> 310 S.E.2d 870. Skyway knew of Lawson's belief that the property line had been incorrectly surveyed, <u>see, e.g.,</u> Letter, but Skyway took steps to confirm its survey even in the absence of any opposing survey demonstrating a different boundary. McMillen Dep. 57-60; <u>see</u>

Emails LH 0019-0020, 00368-369 Ex. J. Pl.'s Resp. Skyway did not have reason to believe that its conduct would "inevitably or probably result in injury" to Lawson. <u>Stephens</u> 775 S.E.2d at 118. Considering the precautions taken by Skyway and its reliance on the work of its surveyor, Lawson has not adequately demonstrated any actions that rise to the high level of bad conduct required to receive punitive damages. See <u>Perrine</u> 694 S.E.2d at 909-10.

IV. Conclusion

In accordance with the foregoing discussion it is ORDERED the defendant's motion for summary judgment on the issue of punitive damages be, and it hereby is, granted.

The Clerk is requested to transmit this order to all counsel of record and any unrepresented parties.

DATED: July 11, 2018

John T. Copenhaver, Jr.
United States District Judge